NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE DEPENDENCY AS TO G.B.

No. 1 CA-JV 22-0286
FILED 5-4-2023

Appeal from the Superior Court in Maricopa County
No. JD42295
The Honorable Todd F. Lang, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate's Office, Mesa
By Suzanne Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Vice Chief Judge David B. Gass delivered the decision of the court, in which
Judge Brian Y. Furuya and Judge Andrew M. Jacobs joined.

**G A S S**, Vice Chief Judge:

¶1        Father appeals the superior court's dependency adjudication and placement of G.B., his biological child. G.B.'s mother is not a party to this appeal. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2        In August 2022, mother, an enrolled member of the San Carlos Apache Tribe, gave birth to G.B., a child she shares with father. Because G.B. was born substance-exposed to methamphetamine, she spent her first 25 days of life in the neonatal intensive care unit (NICU).

¶3        A few days after G.B. was born, The Department of Child Safety (DCS) interviewed mother and father. Though father suspected he could be G.B.'s biological parent, he refused to engage in services until DCS confirmed his paternity. And he only sporadically visited G.B. in the NICU. Nevertheless, father completed a drug test at the end of August, and DCS informed him he tested positive for methamphetamines. Father denied any substance use but had engaged in services through Terros in 2016 and had tested positive for amphetamine four times between February and June 2016.

¶4        On September 8, 2022, DCS took G.B. into custody because it could not identify "services or supports" to allow G.B. to live safely with mother or father. And DCS did not find—nor did mother or father suggest—any other kinship placement options. Because G.B. is an Indian child under the Indian Child Welfare Act of 1978 (ICWA), DCS also contacted the San Carlos Apache Tribe regarding their jurisdiction over the case. In response, the Tribe only asked for notification when DCS had filed the dependency petition.

¶5        On September 9, 2022, DCS filed a dependency petition. Later that month, DCS called father to inform him the paternity test results confirmed he is the biological parent of G.B. But father continued to refuse to participate in services until he saw the DNA report itself, stating that he wanted to know parentage "for sure." Later, at the dependency hearing, a DCS case manager testified she called father in November 2022 and talked about drug testing and services with Terros. Father, though, denied being aware of DCS's request for him to drug test.

¶6        Father asked DCS to place G.B. with G.B.'s paternal grandmother because father lived with her, and she was the primary caregiver for two of father's other children for the last three years. DCS interviewed paternal grandmother, who expressed concerns about caring for G.B. because father had not been very involved with parenting his other

children. Paternal grandmother also did not know about father's substance use or his recent positive test and had no experience caring for a child born substance-exposed.

¶7            In December 2022, the superior court held a dependency adjudication hearing. The superior court heard testimony from father, paternal grandmother, a DCS child safety specialist, and the Tribe's ICWA coordinator. DCS also presented its preliminary protective hearing report and father's drug-testing records.

¶8            During the hearing, father testified he received the physical copy of the DNA report a few weeks before the hearing and would participate in services. At the time of the hearing, father had been working for about three weeks and was not sure of his monthly income. Paternal grandmother also testified she was willing to "assist" with G.B.'s care in her home. And father said paternal grandmother's house has a room for G.B., even though he had not yet filled it with supplies.

¶9            The DCS child safety specialist and the ICWA coordinator, however, both testified they had reservations about placing G.B. in paternal grandmother's home before father had shown sobriety, a safe and stable home, reliable income, and more parental engagement. The ICWA coordinator also testified he believed good cause existed to deviate from ICWA's placement preferences, but he supported a family reunification case plan. The superior court shared the same concerns and found father's recent drug use and his delay in participating in services caused a barrier to G.B.'s placement with him.

¶10            On that basis, the superior court found G.B. dependent as to father and "continued custody of the child by the father is likely to result in serious emotional or physical danger to the child." Additionally, the superior court found DCS made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and that the efforts have proven unsuccessful." Lastly, the superior court ordered DCS to evaluate paternal grandmother for possible placement and complete expedited background checks on all adult members of her home.

¶11            This court has jurisdiction over father's timely appeal under article VI, section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21.A.1 and -2101.A.1.

## ANALYSIS

I. **Reasonable evidence supports the superior court's dependency finding.**

¶12          Father argues the superior court abused its discretion because reasonable evidence did not support finding G.B. dependent.

¶13          This court reviews a dependency finding for an abuse of discretion and will affirm the order unless no reasonable evidence supports the factual findings upon which it is based. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488 ¶ 12 (App. 2015). The superior court is in the "best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234 ¶ 13 (App. 2011) (citation omitted). This court, thus, views the facts and draws reasonable inferences in the light most favorable to affirming the superior court. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549 ¶ 7 (App. 2010).

¶14          "Dependent child" includes a child "who has no parent or guardian willing to exercise or capable of exercising [proper and effective parental] care and control." A.R.S. § 8-201(15)(a)(i). The superior court must consider "the circumstances existing at the time of the adjudication hearing[,]" and not just past circumstances. *Francine C. v. Dep't of Child Safety*, 249 Ariz. 289, 300 ¶ 35 (App. 2020) (citation omitted). And the superior court must support a dependency adjudication with at least one specific factual finding. *Id.* at 295 ¶ 12. But the superior court need not "detail *each* fact that supports its ruling." *Id.* at 296 ¶ 14.

¶15          The superior court found G.B. dependent because father had recently used methamphetamines and then delayed participating in services until he had "legal confirmation" he was G.B.'s father. At trial, DCS presented evidence of father's recent and past drug-use, and the superior court considered that evidence in its dependency finding. The superior court explained—though father had the right to wait to participate in services until he had "legal confirmation" of his paternity—"[t]he barrier to in-home [placement] with [father] is demonstrating sobriety, and that is a barrier we can overcome fairly quickly."

¶16          Father argues DCS failed to "effectively communicate[]" its desire to have him participate in drug testing between August and November 2022, and he could not test until December 2022. He also argues there was no evidence his drug use resulted in a "substantial risk of harm" to G.B. nor affected his ability to parent G.B.

**¶17** Though father was willing to participate in services at the time of trial, he had not yet participated. Additionally, father argues he had sufficient income and housing to support G.B. But at the time of trial, he had worked at his current job for only three weeks and could not provide his estimated monthly salary. On this record, the superior court acted within its discretion to find father needed to show sobriety before placing G.B. in his home.

**¶18** Father also argues there was no evidence of abuse or neglect. But DCS did not allege any abuse or neglect, and the superior court did not rely on abuse or neglect in its dependency finding. This court, thus, need not address those arguments.

**II. The superior court did not violate ICWA by placing G.B. in foster care.**

**¶19** Father argues the superior court erred by failing to make a finding of good cause to deviate from ICWA's placement preferences and because no evidence established good cause. DCS claims: (1) father waived any challenge to the sufficiency of the superior court's good-cause findings; (2) the superior court did not deviate from ICWA's placement preferences; and (3) if the placement did deviate, the superior court had good cause for the deviation.

**¶20** Father argues 25 U.S.C. § 1915(b) requires the superior court find good cause to deviate from ICWA's placement priorities. Unless good cause provides otherwise, ICWA requires a superior court prioritize placement with "a member of the Indian child's extended family" before a foster home. *Id.* Before foster-home placement, the superior court must also find DCS made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).

**¶21** ICWA does not require the superior court to make good-cause findings on the record. *See* 25 U.S.C. § 1915(b). Arizona law, however, does. In dependency cases subject to ICWA, the superior court must "make findings pursuant to the standards and burdens of proof required under ICWA and the Regulations, including . . . whether there is good cause to deviate from the preferences." Ariz. R.P. Juv. Ct. 338(h)(6). But if a party believes the superior court "did not enter sufficient findings of fact or legal conclusions as required by law," the party must move to alter or amend the order "no later than 12 days after the entry of the final order." Ariz. R.P. Juv. Ct. 317(a)(2), (b)(1).

**¶22** We need not reach the waiver issue because the superior court made sufficient findings under ICWA to place G.B. in foster care. The superior court found: (1) "continued custody of the child by father is likely to result in serious emotional or physical danger to the child"; and (2) DCS made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." The record supports these findings.

**¶23** But father argues the record does not support those findings because "no reasonable evidence" established G.B. dependent as to father. As discussed above, reasonable evidence supported the superior court's dependency finding because father used methamphetamines and had only recently engaged in rehabilitation services. Because father asserts no other reasoning, we do not discuss the issue further and find no error.

**CONCLUSION**

**¶24** We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA